(Slip Opinion) OCTOBER TERM, 2007 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NEW JERSEY *v.* DELAWARE

### ON EXCEPTIONS TO THE REPORT OF THE SPECIAL MASTER

No. 134, Orig.   Argued November 27, 2007—Decided March 31, 2008

This is the third original action between New Jersey and Delaware involving the boundary along the Delaware River (or River) separating the two States.  The first action was settled by a compact the two States approved in 1905, and Congress ratified in 1907 (1905 Compact or Compact).  See *New Jersey* v. *Delaware*, 205 U. S. 550 *(New Jersey* v. *Delaware I).*  The 1905 Compact addressed fishing rights but did not define the interstate boundary line.  Two provisions of the Compact sowed the seeds for further litigation.  Article VII provided: "Each State may, on its own side of the river, continue to exercise riparian jurisdiction of every kind and nature." But Article VIII added: "Nothing herein . . . shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth."   The second action, resolved by this Court in 1934, conclusively determined the location of the interstate boundary: Delaware owned "the river and the subaqueous soil" within a twelve-mile circle centered on New Castle, Del., "up to [the] low water mark on the easterly or New Jersey side"; south of the twelve-mile circle, the middle of the River's main ship channel marked the boundary.  *New Jersey* v. *Delaware II*, 291 U. S. 361, 385.

The current controversy was sparked by the Delaware Department of Natural Resources and Environmental Control's (DNREC) refusal to grant British Petroleum permission to construct a liquefied natural gas (LNG) unloading terminal projected to extend beyond New Jersey's shore some 2,000 feet into Delaware territory.  DNREC determined that, under Delaware's Costal Zone Act (DCZA), the proposed terminal would be an "offshore bulk product transfer facilit[y]" as well as a "heavy industry use," both prohibited by the Act.  New Jersey commenced this action, seeking a declaration that Article VII

of the 1905 Compact gave it exclusive regulatory authority over all projects appurtenant to its shores, including wharves extending past the low-water mark on New Jersey's side into Delaware territory. Delaware's answer asserted that, under, *inter alia*, Article VIII of the Compact and *New Jersey* v. *Delaware II*, it had regulatory authority, undiminished by Article VII, over structures located within its borders. On cross-motions for summary judgment, the Special Master filed a report recommending a determination by this Court that the "riparian jurisdiction" preserved to New Jersey by Article VII is not exclusive and that Delaware has overlapping jurisdiction, within the twelve-mile circle, to regulate improvements outshore of the low-water mark on the New Jersey side of the River. New Jersey filed exceptions.

*Held:* Article VII of the 1905 Compact did not secure to New Jersey *exclusive* jurisdiction over all riparian improvements commencing on its shores; New Jersey and Delaware have overlapping authority to regulate riparian structures and operations of extraordinary character extending outshore of New Jersey's domain into territory over which Delaware is sovereign. Pp. 8–23.

   (a) The Court rejects New Jersey's argument that Article VII, which accords each State "riparian jurisdiction of every kind and nature," bars Delaware from any encroachment upon New Jersey's authority over improvements extending from New Jersey's shore. Pp. 8–16.

      (1) The novel term "riparian jurisdiction," as used in Article VII, is properly read as a limiting modifier and does not mean "exclusive jurisdiction." "[R]iparian jurisdiction" has never been a legal term of art, and appears to be a verbal formulation the 1905 Compact negotiators devised specifically for Article VII. Elsewhere in the 1905 Compact—most notably, in Article VIII—the more familiar term "jurisdiction" or "exclusive jurisdiction" appears. Attributing to "riparian jurisdiction" the same meaning as "jurisdiction" unmodified, or equating the novel term with the formulation "exclusive jurisdiction," would deny operative effect to each word in the Compact. See *United States* v. *Menasche*, 348 U. S. 528, 538–539. Presumably drafted in recognition of the still-unresolved boundary dispute, Article VIII requires an express statement in the Compact in order to "affect the territorial . . . jurisdiction of either State . . . over the Delaware River." The Court resists reading the uncommon term "riparian jurisdiction," even when aggrandized by the phrase "of every kind and nature," as effectuating a transfer to New Jersey of Delaware's entire "territorial . . . jurisdiction . . . over [the portion of] the Delaware River [in question]." Pp. 10–11.

      (2) A riparian landowner ordinarily enjoys the right to build a

wharf to access navigable waters far enough to permit the loading and unloading of ships. But that right, New Jersey agrees, is subject to state regulation for the protection of the public. New Jersey sees itself, however, as the only State empowered to regulate, for the benefit of the public, New Jersey landowners' exercise of riparian rights. Commonly, the State that grants riparian rights also has regulatory authority over their exercise. But the 1905 Compact's negotiators faced an unusual situation: As long as the boundary issue remained unsettled, they could not know which State was sovereign within the twelve-mile circle beyond New Jersey's shore. They likely knew, however, that "[t]he rights of a riparian owner [seeking to wharf out into] a navigable stream . . . are governed by the law of the state in which the stream is situated." *Weems Steamboat Co. of Baltimore* v. *People's Steamboat Co.*, 214 U. S. 345, 355. With the sovereignty issue reserved by the 1905 Compact for another day, it is difficult to gainsay the Special Master's conclusion that Article VII's reference to "riparian jurisdiction" did not mean "exclusive jurisdiction." Endeavoring to harmonize Article VII with the boundary determination, the Special Master concluded that Article VII's preservation to each State of "riparian jurisdiction" gave New Jersey control of the riparian rights ordinarily and usually enjoyed by landowners on New Jersey's shore. But once the boundary line at low water is passed, the Special Master further concluded, New Jersey's regulatory authority is qualified. Just as New Jersey cannot grant land belonging to Delaware, New Jersey cannot authorize activities that go beyond the exercise of ordinary and usual riparian rights in the face of contrary regulation by Delaware. Pp. 12–16.

(b) An 1834 compact between New Jersey and New York establishing the two States' common Hudson River boundary casts informative light on the 1905 New Jersey-Delaware Compact. Similar to the boundary settled in *New Jersey* v. *Delaware II*, the 1834 accord located the New Jersey-New York boundary at "the low water-mark on the . . . New Jersey side [of the Hudson River,]" 4 Stat. 710. Unlike the 1905 Compact, however, the 1834 agreement expressly gave New Jersey "the *exclusive right* of property in and to . . . land under water" and "*the exclusive jurisdiction of and over the wharves, docks, and improvements . . . on the shore of the said state . . . ,*" *ibid.* (emphasis added). Comparable language is noticeably absent in Article VII of the 1905 Compact, while other provisions of the Compact appear to have been adopted almost verbatim from the 1834 New Jersey-New York accord. New Jersey, therefore, could hardly claim ignorance that Article VII could have been but was not drafted to grant it "exclusive jurisdiction" (not merely "riparian jurisdiction") over wharves and other improvements extending from its shore into navigable wa-

ters.  Pp. 16–17.

(c) *Virginia* v. *Maryland*, 540 U. S. 56, 75—in which this Court held that a Maryland-Virginia boundary settlement gave Virginia "sovereign authority, free from regulation by Maryland, to build improvements appurtenant to [Virginia's] shore and to withdraw water from the [Potomac] River"— provides scant support for New Jersey's claim.  As the Special Master explained, the result in *Virginia* v. *Maryland* turned on the unique language of the 1785 compact and 1877 arbitration award there involved.  The 1785 compact addressed only "the right [of the citizens of each State] to build wharves and improvements regardless of which State ultimately was determined to be sovereign over the River," *id.,* at 69.  Concerning the States themselves, the 1877 arbitration award that settled the boundary was definitive.  See *id.,* at 75.  By recognizing in that award Virginia's right, "*qua* sovereign," "to use the River beyond low-water mark," *id.,* at 72, the arbitrators manifested their intention to safeguard Virginia's authority to construct riparian improvements outshore of the low-water mark free from regulation by Maryland.  By contrast, neither the 1905 Compact nor *New Jersey* v. *Delaware II* purported to give New Jersey all regulatory oversight (as opposed to only "riparian jurisdiction").   Pp. 17–19.

(d) Delaware's claim to regulatory authority is further supported by New Jersey's acceptance (until the present controversy) of Delaware's jurisdiction over water and land within its domain to preserve the quality and prevent deterioration of its coastal areas.  When New Jersey sought federal approval for its coastal management program, it made the representation—fundamentally inconsistent with its position here—that any New Jersey project extending beyond mean low water within the twelve-mile circle would require coastal permits from both States.  The DNREC, with no objection from New Jersey, had previously rejected as a prohibited bulk transfer facility an earlier request to build a LNG terminal extending from New Jersey into Delaware.  The DNREC issued permits for each of the three structures extending from New Jersey into Delaware built between 1969 and 2006, one of them undertaken by New Jersey itself.  Even during the pendency of this action, New Jersey applied to Delaware for renewal of the permit covering the portion of New Jersey's project that extended into Delaware.  Pp. 19–22.

(e) Nowhere does Article VII "expressly set forth," in Article VIII's words, Delaware's lack of any governing authority over territory within the State's own borders.  The Special Master correctly determined that Delaware's pre-1971 "hands off" policy regarding coastal development did not signal that the State never could or never would assert any regulatory authority over structures using its subaqueous

Syllabus

land. In the decades since *Delaware*, pursuant to the DCZA, began to manage its waters and submerged lands, the State has followed a consistent course: Largely with New Jersey's cooperation, Delaware has checked proposed structures and activity extending beyond New Jersey's shore into Delaware's domain in order to protect the natural environment of its coastal areas. Pp. 22–23.

(f) Given the authority over riparian rights preserved for New Jersey by the 1905 Compact, Delaware may not impede ordinary and usual exercises of the right of riparian owners to wharf out from New Jersey's shore. The project British Petroleum sought to construct and operate, however, goes well beyond the ordinary or usual. Delaware's classification of the proposed LNG unloading terminal as a "heavy industry use" and a "bulk product transfer facilit[y]" under the DCZA has not been, and hardly could be, challenged as inaccurate. Consistent with the scope of Delaware's retained police power to regulate certain riparian uses, it was within that State's authority to prohibit construction of the LNG facility. P. 23.

Delaware's authority to deny British Petroleum permission to construct the proposed LNG terminal confirmed; New Jersey's exceptions overruled; and the Special Master's proposed decree entered with modifications consistent with the Court's opinion.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, SOUTER, and THOMAS, JJ., joined, and in which STEVENS, J., joined as to paragraphs 1(c), 2, 3, and 4 of the Decree. STEVENS, J. filed an opinion concurring in part and dissenting in part. SCALIA, J., filed a dissenting opinion, in which ALITO, J., joined. BREYER, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports.  Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 134, Orig.

_____

## STATE OF NEW JERSEY, PLAINTIFF *v.* STATE OF DELAWARE

### ON BILL OF COMPLAINT

[March 31, 2008]

JUSTICE GINSBURG delivered the opinion of the Court.

The States of Delaware and New Jersey seek this Court's resolution of a dispute concerning their respective regulatory authority over a portion of the Delaware River within a circle of twelve miles centered on the town of New Castle, Delaware.  In an earlier contest between the two States, this Court upheld the title of Delaware to "the river and the subaqueous soil" within the circle "up to [the] low water mark on the easterly or New Jersey side." *New Jersey* v. *Delaware*, 291 U. S. 361, 385 (1934) *(New Jersey* v. *Delaware II)*.[1]  Prior to that 1934 boundary determination, in 1905, the two States had entered into an accord (1905 Compact or Compact), which Congress ratified in 1907.  The Compact accommodated both States' concerns on matters over which the States had crossed swords: service of civil and criminal process on vessels and rights of fishery within the twelve-mile zone.  Although the parties were unable to reach agreement on the inter-

_____

[1] A map showing the interstate boundary line is annexed to the Court's Decree.  *New Jersey* v. *Delaware II*, 295 U. S. 694, 700 (1935). Six of New Jersey's municipalities have one boundary all or partially at the low-water mark of the Delaware River within the twelve-mile circle.

state boundary at that time, the 1905 Compact contained two jurisdictional provisions important to the current dispute:

> "Art. VII.  Each State may, on its own side of the river, continue to exercise riparian jurisdiction of every kind and nature, and to make grants, leases, and conveyances of riparian lands and rights under the laws of the respective States.
>
> "Art. VIII.  Nothing herein contained shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth."  Act of Jan. 24, 1907, 34 Stat. 860.

The controversy we here resolve was sparked by Delaware's refusal to grant permission for construction of a liquefied natural gas (LNG) unloading terminal that would extend some 2,000 feet from New Jersey's shore into territory *New Jersey* v. *Delaware II* adjudged to belong to Delaware.  The LNG plant, storage tanks, and other structures would be maintained onshore in New Jersey.  Relying on Article VII of the 1905 Compact, New Jersey urged that it had exclusive jurisdiction over all projects appurtenant to its shores, including wharves extending past the low-water mark on New Jersey's side into Delaware territory.  Delaware asserted regulatory authority, undiminished by Article VII, over structures located within its borders; in support, Delaware invoked, *inter alia*, Article VIII of the 1905 Compact and our decision in *New Jersey* v. *Delaware II*.  The Special Master we appointed to superintend the proceedings filed a report recommending a determination that Delaware has authority to regulate the proposed construction, concurrently with New Jersey, to the extent that the project reached beyond New Jersey's border and extended into Delaware's domain.

We accept the Special Master's recommendation in principal part. Article VII of the 1905 Compact, we hold, did not secure to New Jersey *exclusive* jurisdiction over all riparian improvements commencing on its shores.[2] The parties' own conduct, since the time Delaware has endeavored to regulate coastal development, supports the conclusion to which other relevant factors point: New Jersey and Delaware have overlapping authority to regulate riparian structures and operations of extraordinary character extending outshore of New Jersey's domain into territory over which Delaware is sovereign.

I

Disputes between New Jersey and Delaware concerning the boundary along the Delaware River (or River) separating the two States have persisted "almost from the beginning of statehood." *New Jersey* v. *Delaware II*, 291 U. S., at 376. The history of the States' competing claims of sovereignty, rehearsed at length in *New Jersey* v. *Delaware II*, need not be detailed here. In brief, tracing title through a series of deeds originating with a 1682 grant from the Duke of York to William Penn, Delaware asserted dominion, within the twelve-mile circle, over the River and its subaqueous lands up to the low-water mark on the New Jersey side. *Id.,* at 364, 374.[3] New Jersey claimed sovereign ownership up to the middle of the navigable channel. *Id.,* at 363–364.

The instant proceeding is the third original action New Jersey has commenced against Delaware involving the Delaware River boundary between the two States. The first action, *New Jersey* v. *Delaware*, No. 1, Orig. (filed

---

[2] All Members of the Court agree that New Jersey lacks exclusive jurisdiction over riparian structures. *Post*, at 7 (opinion of SCALIA, J.); *post*, at 1 (opinion of STEVENS, J.).

[3] The "low-water mark" of a river is "the point to which the water recedes at its lowest stage." Black's Law Dictionary 1623 (8th ed. 2004).

1877) *(New Jersey* v. *Delaware I)*, was propelled by the States' disagreements over fishing rights. See Report of Special Master 3 (Report).[4] That case "slumbered for many years." *New Jersey* v. *Delaware II*, 291 U. S., at 377. Eventually, the parties negotiated a Compact, which both States approved in 1905, and Congress ratified in 1907. See Act of Jan. 24, 1907, ch. 394, 34 Stat. 858. Modest in comparison to the parties' initial aim, the Compact left location of the interstate boundary an unsettled question.[5] New Jersey then withdrew its complaint and this Court dismissed the case without prejudice. *New Jersey* v. *Delaware I*, 205 U. S. 550 (1907).

The second original action, *New Jersey* v. *Delaware II*, was fueled by a dispute over ownership of an oyster bed in the River below the twelve-mile circle. See Report 14. In response to New Jersey's complaint, the Court conclusively settled the boundary between the States. Confirming the Special Master's report, the Court held that, within the twelve-mile circle, Delaware owns the River and the subaqueous soil up to the low-water mark on the New Jersey side. 291 U. S., at 385.[6] But New Jersey

_____

[4] The Report of the Special Master, and all public filings in this case, are available at http://www.pierceatwood.com/custompagedisplay.asp?Show=2.

[5] After the States approved the Compact, but prior to Congress' ratification, the parties submitted a joint application for suspension of Court proceedings pending action by the National Legislature. *New Jersey* v. *Delaware I*, O. T. 1905, No. 1, Orig., Statement of reasons submitted orally for the joint application of Counsel on both sides for suspension of proceedings until the further order of the Court (reproduced in 1 App. of Delaware on Cross-Motions for Summary Judgment 190 (hereinafter Del. App.)). In that submission, Delaware's counsel represented that "[t]he compact . . . was . . . not a settlement of the disputed boundary, but a truce or *modus vivendi*." *Ibid.* Counsel further stated that the "main purpose" of the Compact was to authorize joint regulation of "the business of fishing in the Delaware River and Bay." *Ibid.*

[6] The dissent suggests, *post*, at 3, that the long dormant first original action "appeared to be going badly" for Delaware. The strength of

gained the disputed oyster bed: South of the circle, the Court adjudged the boundary "to be the middle of the main ship channel in Delaware River and Bay." *Ibid.* See also *New Jersey* v. *Delaware II,* 295 U. S. 694, 699 (1935) (Decree) (perpetually enjoining the States from further disputing the boundary).

In upholding Delaware's title to the area within the twelve-mile circle, the Court rejected an argument pressed by New Jersey based on the 1905 Compact: By agreeing to the Compact, New Jersey urged, Delaware had abandoned any claim of ownership beyond the middle of the River. The Court found New Jersey's argument "wholly without force." 291 U. S., at 377. "The compact of 1905," the Court declared, "provides for the enjoyment of riparian rights, for concurrent jurisdiction in respect of civil and criminal process, and for concurrent rights of fishery. Beyond that it does not go." *Id.*, at 377–378. The Court next recited in full the text of Article VIII of the Compact: "Nothing herein contained shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth." *Id.,* at 378 (internal quotation marks omitted).

## II

The current controversy arose out of the planned construction of facilities to import, store, and vaporize foreign-source LNG; the proposed project would be operated by Crown Landing, LLC, a wholly owned subsidiary of British Petroleum (BP). See Report 19; 6 App. of Delaware on Cross-Motions for Summary Judgment 3793, 3804–3807 (hereinafter Del. App.) (Request for Coastal Zone Status Decision). The "Crown Landing" project

——————

Delaware's claim to sovereign ownership of the riverbed within the twelve-mile circle, however, is comprehensively described in *New Jersey* v. *Delaware II*, 291 U. S., at 364–378.

would include a gasification plant, storage tanks, and other structures onshore in New Jersey, and a pier and related structures extending some 2,000 feet from New Jersey's shore into Delaware. Report 19–20; 6 Del. App. 3804. Supertankers with capacities of up to 200,000 cubic meters (more than 40 percent larger than any ship then carrying natural gas) would berth at the pier. *Id.,* at 3810.[7] A multipart transfer system—including, *inter alia*, cryogenic piping, a containment trough, and utility lines— would be installed on the 6,000-square-foot unloading platform and along the pier to transport the LNG (at sufficiently cold temperatures to keep it in a liquid state) from ships to three 158,000-cubic-meter storage tanks onshore; vapor byproducts resulting from the onshore gasification would be returned to the tankers. Report 19– 20; 6 Del. App. 3804; 7 *id.,* at 4307 (Cherry Affidavit). Even "[d]uring the holding mode of terminal operation (when no ship is unloading)," LNG would circulate through the piping along the pier to "keep the line cold." 6 *id.,* at 3804. Construction of the Crown Landing project would require dredging 1.24 million cubic yards of subaqueous soil, affecting approximately 29 acres of the riverbed within Delaware's territory. Report 19–20.[8]

In September 2004, BP sought permission from Delaware's Department of Natural Resources and Environmental Control (DNREC) to construct the Crown Landing

---

[7] Two or three LNG supertankers, it was anticipated, would arrive at the unloading terminal each week. 7 Del. App. 4307 (Affidavit of Philip Cherry, Delaware Dept. of Natural Resources and Environmental Control, Director of Policy and Planning) (hereinafter Cherry Affidavit). In transit, the ships would pass densely populated areas, *id.,* at 4307– 4308; a moving safety zone would restrict other vessels 3,000 feet ahead and behind, and 1,500 feet on all sides of a supertanker, *id.,* at 4308.

[8] The dissent points to other projects involving extensive dredging. *Post*, at 16. The examples presented, however, involved large-scale public works, not privately owned and operated facilities.

unloading terminal. See *id*., at 20.[9]  DNREC refused permission some months later on the ground that the terminal was barred by Delaware's Coastal Zone Act (DCZA), Del. Code Ann., Tit. 7, §7001 *et seq.* (2001),[10] as a prohibited "offshore . . . bulk product transfer facilit[y]" as well as a prohibited "heavy industry us[e]," §7003; Report 20.[11]

Reactions to DNREC's decision boiled over on both sides. New Jersey threatened to withdraw state pension funds from Delaware banks, and Delaware considered authorizing the National Guard to protect its border from encroachment. See Report 21. One New Jersey legislator looked into recommissioning the museum-piece battleship U. S. S. *New Jersey*, in the event that the vessel might be needed to repel an armed invasion by Delaware. See *ibid*.

New Jersey commenced the instant action in 2005, seeking a declaration that Article VII of the 1905 Compact establishes its exclusive jurisdiction "to regulate the construction of improvements appurtenant to the New Jersey shore of the Delaware River within the Twelve-Mile Cir-

---

[9] Three months after seeking Delaware's permission, BP commenced the permitting process in New Jersey, by filing a Waterfront Development Application with New Jersey's Department of Environmental Protection. Report 20.

[10] Delaware's Coastal Zone Act (DCZA) is designed "to control the location, extent and type of industrial development in Delaware's coastal areas. . . . and [to] safeguard th[e] use [of those areas] primarily for recreation and tourism." Del. Code Ann., Tit. 7, §7001 (2001).

[11] On BP's appeal, Delaware's Coastal Zone Industrial Control Board affirmed DNREC's determination that the Crown Landing project was a bulk product transfer facility prohibited by the DCZA. BP did not appeal the decision, rendering it a final determination. Report 20–21. The dissent suspects that Delaware's permit denial may have been designed to lure BP away from New Jersey, siting the plant, instead, on Delaware's "own shore." *Post*, at 19. Delaware law, however, proscribes "[h]eavy industry us[e]," Del. Code Ann., Tit. 7, §7003, in any area within "[t]he coastal zone" over which Delaware is sovereign, §7002(a). Nothing whatever in the record before us warrants the suggestion that Delaware acted duplicitously.

cle, free of regulation by Delaware." Motion to Reopen and for Supplemental Decree 35; see Report 22, 29. We granted leave to file a bill of complaint. 546 U. S. 1028 (2005). Delaware opposed New Jersey's reading of Article VII, and maintained that the 1905 Compact did not give New Jersey exclusive authority to "approve projects that encroach on Delaware submerged lands without any say by Delaware." Brief for Delaware in Opposition to New Jersey's Motion to Reopen and for Supplemental Decree 21; see Report 23, 29.

The Special Master appointed by the Court, Ralph I. Lancaster, Jr., 546 U. S. 1147 (2006), superintended discovery and carefully considered nearly 6,500 pages of materials presented by the parties in support of cross-motions for summary judgment. Report 27. He ultimately determined that the "riparian jurisdiction" preserved to New Jersey by Article VII of the 1905 Compact "is not exclusive" and that Delaware "has overlapping jurisdiction to regulate . . . improvements outshore of the low water mark on the New Jersey side of the River." *Id.*, at 32. New Jersey filed exceptions to which we now turn.[12]

### III

At the outset, we summarize our decision and the principal reasons for it. In accord with the Special Master, we hold that Article VII of the 1905 Compact does not grant New Jersey exclusive jurisdiction over all riparian improvements extending outshore of the low-water mark. First, the novel term "riparian jurisdiction," which the parties employed in the Compact, is properly read as a

_____

[12] New Jersey takes no exception to the Special Master's determinations that Delaware was not judicially estopped from challenging New Jersey's interpretation of Article VII, Report 86–92, and that Delaware has not lost jurisdiction through prescription and acquiescence, *id.,* at 92–99. See Exceptions by New Jersey to Report of Special Master and Supporting Brief 16, n. 5 (hereinafter New Jersey Exceptions).

limiting modifier and not as synonymous with "exclusive jurisdiction." Second, an 1834 compact between New Jersey and New York casts informative light on the later New Jersey-Delaware accord. Third, our decision in *Virginia* v. *Maryland*, 540 U. S. 56 (2003), provides scant support for New Jersey's claim. We there held that a Maryland-Virginia *boundary settlement* gave Virginia "sovereign authority, free from regulation by Maryland, to build improvements appurtenant to [Virginia's] shore and to withdraw water from the [Potomac] River." *Id.,* at 75. Delaware's 1905 agreement to New Jersey's exercise of "riparian jurisdiction," *made when the boundary was still disputed*, cannot plausibly be read as an equivalent recognition of New Jersey's sovereign authority. Finally, Delaware's claim to regulating authority is supported by New Jersey's acceptance (until the present controversy) of Delaware's jurisdiction over water and land within its domain to preserve the quality and prevent deterioration of the State's coastal areas.

A

New Jersey hinges its case on Article VII of the 1905 Compact, which it reads as conferring on "each State complete regulatory authority over the construction and operation of riparian improvements on its shores, even if the improvements extend past the low-water mark." Exceptions by New Jersey to Report of Special Master and Supporting Brief 16 (hereinafter New Jersey Exceptions). *New Jersey* v. *Delaware II*, New Jersey recognizes, confirmed Delaware's sovereign ownership of the River and subaqueous soil within the twelve-mile circle. But, New Jersey emphasizes, the Court expressly made that determination "subject to the Compact of 1905." 291 U. S., at 385. New Jersey acknowledges that Delaware "unquestionably can exercise its police power outshore of the low-water mark." New Jersey Exceptions 16. New Jersey

contends, however, that Delaware cannot do so in a manner that would interfere with the authority over riparian rights that Article VII of the 1905 Compact preserves for New Jersey. *Ibid.*

Because the meaning of the 1905 Compact and, in particular, Article VII, is key to the resolution of this controversy, we focus our attention on that issue. Significantly, Article VII provides that "[e]ach State may, on its own side of the river, continue to exercise" not "exclusive jurisdiction" or "jurisdiction" unmodified, but "riparian jurisdiction of every kind and nature" 34 Stat. 860. New Jersey argues that "riparian jurisdiction" should be read broadly to encompass full police-power jurisdiction over activities carried out on riparian structures. New Jersey Exceptions 36–37. If New Jersey enjoys full police power over improvements extending from its shore, New Jersey reasons, then necessarily Delaware cannot encroach on that authority. See Report 54.

1

We agree with the Special Master that "'riparian' is a limiting modifier." Report 57. Interpreting an interstate compact, "[j]ust as if [we] were addressing a federal statute," *New Jersey* v. *New York*, 523 U. S. 767, 811 (1998), it would be appropriate to construe a compact term in accord with its common-law meaning, see *Morissette* v. *United States*, 342 U. S. 246, 263 (1952). The term "riparian jurisdiction," however, was not a legal term of art in 1905, nor is it one now. See 7 Del. App. 4281 (Expert Report of Professor Joseph L. Sax (Nov. 7, 2006)). As the Special Master stated, "riparian jurisdiction" appears to be a verbal formulation "devised by the [1905 Compact] drafters specifically for Article VII." Report 54.[13]

———————
[13] The term appears in no other interstate compact. New Jersey's codification of the 1905 Compact, N. J. Stat. Ann. §52:28–41 (West 2001), includes the term, but our attention has been called to no other

Opinion of the Court

Elsewhere in the Compact, one finds the more familiar terms "jurisdiction" (in the introductory paragraphs and, most notably, in Article VIII) or "exclusive jurisdiction" (in Article IV).[14]   To attribute to "riparian jurisdiction" the same meaning as "jurisdiction" unmodified, or to equate the novel term with the distinct formulation "exclusive jurisdiction," would deny operative effect to each word in the Compact, contrary to basic principles of construction. See *United States* v. *Menasche*, 348 U. S. 528, 538–539 (1955).

In this regard, Article VIII bears reiteration:

> "Nothing herein contained shall affect the territorial limits, rights, or jurisdiction of either State of, in, or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth."  34 Stat. 860.

Presumably drafted in recognition of the still-unresolved boundary dispute, see *supra*, at 3–5, Article VIII requires an express statement in the Compact in order to "affect the territorial . . . jurisdiction of either State . . . over the Delaware River."  We resist reading the uncommon term "riparian jurisdiction," even when aggrandized by the phrase "of every kind and nature," as tantamount to an express cession by Delaware of its entire "territorial . . . jurisdiction . . . over the Delaware River."

2

Endeavoring to fathom the import of the novel term "riparian jurisdiction," the Special Master recognized that

---

state statute that does so.

[14] The last paragraph of Article IV reads: "Each State shall have and exercise *exclusive jurisdiction* within said river to arrest, try, and punish its own inhabitants for violation of the concurrent legislation related to fishery herein provided for."  34 Stat. 860 (emphasis added). See also *id.,* at 859 (Articles I and II, recognizing the "exclusive jurisdiction" of each State in regard to service of criminal process).

a riparian landowner ordinarily enjoys the right to build a wharf to access navigable waters far enough to permit the loading and unloading of ships. Report 47–49, 58–59. Accord 1 H. Farnham, Law of Waters and Water Rights §62, p. 279 (1904) ("The riparian owner is also entitled to have his contact with the water remain intact. This is what is known as the right of access, and includes the right to erect wharves to reach the navigable portion of the stream."); *id.,* §111, p. 520 ("A wharf is a structure on the margin of navigable water, alongside of which vessels are brought for the sake of being conveniently loaded or unloaded."). But the Special Master also recognized that the right of a riparian owner to wharf out is subject to state regulation. Report 58; see 1 Farnham, *supra*, §63, p. 284 (rights of riparian owner "are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public"); *Shively* v. *Bowlby*, 152 U. S. 1, 40 (1894) ("[A] riparian proprietor . . . has the right of access to the navigable part of the stream in front of his land, and to construct a wharf or pier projecting into the stream . . . , subject to such general rules and regulations as the legislature may prescribe for the protection of the public . . . ." (internal quotation marks omitted)).

New Jersey took no issue with the Special Master's recognition that States, in the public interest, may place restrictions on a riparian proprietor's activities. In its response to Delaware's request for admissions, New Jersey readily acknowledged that a person wishing to conduct a particular activity on a wharf, in addition to obtaining a riparian grant, would have to comply with all other "applicable New Jersey laws, and local laws." 6 Del. App. 4156 (New Jersey's Responses to Delaware's First Request for Admissions ¶22 (Sept. 8, 2006)). See also Restatement (Second) of Torts §856, Comment *e*, pp. 246–247 (1977) ("A state may exercise its police power by controlling the initiation and conduct of riparian and nonriparian uses of

water."). But New Jersey sees itself, to the exclusion of Delaware, as the State empowered to regulate, for the benefit of the public, New Jersey landowners' exercise of riparian rights.

In the ordinary case, the State that grants riparian rights is also the State that has regulatory authority over the exercise of those rights. But cf. *Cummings* v. *Chicago*, 188 U. S. 410, 431 (1903) (federal regulation of wharfing out in the Calumet River did not divest local government of regulatory authority based on location of project within that government's territory). In this regard, the negotiators of the 1905 Compact faced an unusual situation: As long as the boundary issue remained unsettled, they could not know which State was sovereign within the twelve-mile circle beyond New Jersey's shore. They likely knew, however, that "[i]n a case of wharfing out . . . '[t]he rights of a riparian owner upon a navigable stream in this country are governed by the law of the state in which the stream is situated.'" 1 S. Wiel, Water Rights in the Western States §898, p. 934 (3d ed. 1911) (quoting *Weems Steamboat Co. of Baltimore* v. *People's Steamboat Co.*, 214 U. S. 345, 355 (1909)). With the issue of sovereignty reserved by the 1905 Compact drafters for another day, the Special Master's conclusion that Article VII's reference to "riparian jurisdiction" did not mean "exclusive jurisdiction" is difficult to gainsay.

The Special Master pertinently observed that, as New Jersey read the 1905 Compact, Delaware had given up all governing authority over the disputed area while receiving nothing in return. He found New Jersey's position "implausible." Report 63. "Delaware," the Special Master stated, "would not have willingly ceded all jurisdiction over matters taking place on land that [Delaware adamantly] contended it owned exclusively and outright." *Id.,*

at 64.[15]

New Jersey asserts that Delaware did just that, as shown by representations made during proceedings in *New Jersey* v. *Delaware II*. New Jersey Exceptions 44. Delaware's reply brief before the Special Master in that case stated: "Article VII of the Compact is obviously merely a recognition of the rights of the riparian owners of New Jersey and a cession to the State of New Jersey by the State of Delaware of jurisdiction to regulate those rights." 1 App. of New Jersey on Motion for Summary Judgment 123a. Further, at oral argument before the Special Master in that earlier fray, Delaware's counsel said that, in his view, the 1905 Compact "ceded to the State of New Jersey all the right to control the erection of [wharves extending into the Delaware River from New Jersey's shore] and to say who shall erect them." *Id.,* at 126a–1.

The Special Master in the instant case found New Jersey's position dubious, as do we. The representations Delaware made in the course of *New Jersey* v. *Delaware II*, the Special Master here observed, were "fully consistent with [the Master's] interpretation of Article VII [of the 1905 Compact]." Report 89. New Jersey did indeed preserve "the right to exercise its own jurisdiction over ripar-

_____

[15] The dissent insists that Delaware received "plenty in return." *Post*, at 3. But, in truth, the 1905 Compact gave neither State "plenty." Each State accommodated to the other to assure equal access to fishing rights in the River. See *supra*, at 4, n. 5. Delaware agreed to the Compact "not [as] a settlement of the disputed boundary, but [as] a truce or *modus vivendi*." 1 Del. App. 190. In deciding whether to proceed with the litigation, Delaware's Attorney General advised that the suit "would entail very considerable expense." 2 *id.,* at 1075 (Jan. 31, 1903 letter of Herbert Ward). He noted, however, that the process of preparing Delaware's Answer had "greatly strengthened the belief and reliance of counsel . . . upon the justice of her claim." *Id.,* at 1076. The decision in *New Jersey* v. *Delaware II* confirmed Delaware's conviction. See *supra*, at 4–5, n. 6.

ian improvements appurtenant to its shore." *Ibid.* But, critically, Delaware nowhere "suggested that New Jersey would have the *exclusive* authority to regulate all aspects of riparian improvements, even if on Delaware's land." *Ibid.*

Delaware, in its argument before the Special Master, was equally uncompromising. As a result of the 1934 boundary determination, Delaware urged, "the entire River is on Delaware's 'own side,' and New Jersey consequently ha[d] no 'side' of the River on which to exercise any riparian rights or riparian jurisdiction." *Id.,* at 36. Article VII of the 1905 Compact, according to Delaware, was a "temporary" measure, "entirely . . . contingent on the ultimate resolution of the boundary." *Id.,* at 39. That reading, the Special Master demonstrated, was altogether fallacious. *Id.,* at 36–40.

Seeking to harmonize Article VII with the boundary determination, the Special Master reached these conclusions. First, the 1905 Compact gave New Jersey no authority to *grant* lands owned by Delaware. *Id.,* at 45–46. Second, Article VII's preservation to each State of "riparian jurisdiction" means that New Jersey may control the riparian rights ordinarily and usually enjoyed by landowners on New Jersey's shore. For example, New Jersey may define "how far a riparian owner can wharf out, the quantities of water that a riparian owner can draw from the River, and the like." *Id.,* at 57–58. Nevertheless, New Jersey's regulatory authority is qualified once the boundary line at low water is passed. *Id.,* at 58. Just as New Jersey cannot grant land belonging to Delaware, so New Jersey cannot authorize activities that go beyond the exercise of ordinary and usual riparian rights in the face of contrary regulation by Delaware.

## B

Interstate compacts, like treaties, are presumed to be

"the subject of careful consideration before they are en-
tered into, and are drawn by persons competent to express
their meaning, and to choose apt words in which to em-
body the purposes of the high contracting parties." *Rocca*
v. *Thompson*, 223 U. S. 317, 332 (1912). Accordingly, the
Special Master found informative a comparison of lan-
guage in the 1905 Compact with language contained in an
1834 compact between New Jersey and New York. See
Report 65. That compact established the two States'
common boundary along the Hudson River. Act of June
28, 1834, ch. 126, 4 Stat. 708. Similar to the boundary
between New Jersey and Delaware settled in 1934 in *New
Jersey* v. *Delaware II*, the 1834 accord located the New
Jersey-New York boundary at "the low water-mark on the
westerly or New Jersey side [of the Hudson River]." Art.
Third, 4 Stat. 710; cf. *supra*, at 1. The 1834 agreement,
however, expressly gave to New Jersey "the *exclusive right*
of property in and to the land under water lying west of
the middle of the bay of New York, and west of the middle
of that part of the Hudson river which lies between Man-
hattan island and New Jersey" and "*the exclusive jurisdic-
tion of and over the wharves, docks, and improvements,
made and to be made on the shore of the said state . . .*"
Art. Third, §§1, 2, 4 Stat. 710 (emphasis added).

   "Comparable language [conferring exclusive authority],"
the Special Master observed, "is noticeably absent in the
[1905] Compact." Report 66. The Master found this dis-
parity "conspicuous," *id.*, at 68, for "[s]everal provisions in
the two interstate compacts [contain] strikingly similar
language," *id.*, at 66; see *id.,* App. J (Table Comparing
Similar Provisions in the New Jersey-New York Compact
of 1834 and the New Jersey-Delaware Compact of 1905).
Given that provisions of the 1905 Compact appear to have
been adopted almost verbatim from New Jersey's 1834
accord with New York, see *ibid.*, New Jersey could hardly
claim ignorance that Article VII could have been drafted to

grant New Jersey "exclusive jurisdiction" (not merely "riparian jurisdiction") over wharves and other improvements extending from its shore into navigable Delaware River waters. *Id.,* at 67.[16]

## C

New Jersey urged before the Special Master, and in its exceptions to his report, that *Virginia* v. *Maryland*, 540 U. S. 56, is dispositive of this case.[17] Both cases involved an interstate compact, which left the boundary between the contending States unresolved, and a later determination settling the boundary. And both original actions were referred to Ralph I. Lancaster, Jr., as Special Master. We find persuasive the Special Master's reconciliation of his recommendations in the two actions. See Report 64–65, n. 118.

*Virginia* v. *Maryland* involved a 1785 compact and an 1877 arbitration award. Agreeing with the Special Master, we held that the arbitration award permitted Virginia to construct a water intake structure extending into the Potomac River, even though the award placed Virginia's boundary at the low-water mark on its own side of the Potomac. See 540 U. S., at 75. "Superficially," the Special Master said, "that holding would appear to support New Jersey's argument here, *i.e.*, that construction of wharves off New Jersey's shore should not be subject to regulation by Delaware." Report 64, n. 118. But, the Special Master

---

[16] The 1834 accord was the subject of significant litigation in the years leading up to and surrounding the adoption of the 1905 Compact. Report 67. Notably, New York's highest court concluded Article Third of the 1834 interstate agreement meant what it said: New Jersey had "exclusive" jurisdiction over wharves extending from and beyond its shore; therefore New York lacked authority to declare those wharves to be nuisances. See *New York* v. *Central R. Co. of N. J.*, 42 N. Y. 283, 293 (1870); Report 67.

[17] The dissent, *post*, at 11–13, essentially repeats New Jersey's argument.

explained, the result in *Virginia* v. *Maryland* turned on "the unique language of the compact and arbitration award involved in that case." *Ibid.*

The key provision of the 1785 compact between Maryland and Virginia, we observed, addressed only "the right [of the citizens of each State] to build wharves and improvements regardless of which State ultimately was determined to be sovereign over the River."  540 U. S., at 69.  Concerning the rights of the States, the 1877 arbitration award, not the 1785 compact, was definitive.  See *id.,* at 75.  The key provision of that award recognized the right of Virginia, "*qua* sovereign," "to use the River beyond low-water mark," a right "nowhere made subject to Maryland's regulatory authority."  *Id.,* at 72.

Confirming the "sovereign character" of Virginia's right, we noted, Maryland had proposed to the arbitrators that the boundary line between the States be drawn around "all wharves and other improvements now extending or which may hereafter be extended, by authority of Virginia from the Virginia shore into the [Potomac] beyond low water mark."  *Ibid.,* n. 7 (internal quotation marks omitted).  Although the formulation Maryland proposed was not used in the arbitration award, the arbitrators plainly manifested their intention to accomplish the same end: to safeguard "Virginia's authority to construct riparian improvements outshore of the low water mark without regulation by Maryland."  Report 65, n. 118; see *Virginia* v. *Maryland*, 540 U. S., at 73, n. 7.  By contrast, in the instant case, neither the 1905 Compact, nor *New Jersey* v. *Delaware II*, the 1934 decision settling the boundary dispute, purported to give New Jersey "all regulatory oversight (as opposed to merely riparian oversight)" or to endow New Jersey with authority "exclusive of jurisdiction by Delaware."  Report 65, n. 118; see *supra,* at 10–15.

D

We turn, finally, to the parties' prior course of conduct, on which the Special Master placed considerable weight. See Report 68–84; cf. *O'Connor* v. *United States*, 479 U. S. 27, 33 (1986) ("The course of conduct of parties to an international agreement, like the course of conduct of parties to any contract, is evidence of its meaning.").

Until the 1960's, wharfing out from the New Jersey shore into Delaware territory was not a matter of controversy between the two States. From 1851, when New Jersey began issuing grants for such activity, through 1969, only 11 constructions straddled the interstate boundary. Report 74. At the time of the 1905 Compact and continuing into the 1950's, Delaware, unlike New Jersey, issued no grants or leases for its subaqueous lands. Delaware regulated riparian improvements solely under its common law, which limited developments only to the extent they constituted public nuisances. *Id.,* at 69.

In 1961, Delaware enacted its first statute regulating submerged lands, and in 1966, it enacted broader legislation governing leases of state-owned subaqueous lands. *Id.,* at 70. The State grandfathered piers and wharves built prior to the effective date of the regulations implementing the 1966 statute. *Id.,* at 70–71. Permits were required, however, for modifications to the grandfathered structures and for new structures. *Id.,* at 71.[18]

Then, in 1971, Delaware enacted the DCZA to prevent "a significant danger of pollution to the coastal zone." Del. Code Ann., Tit. 7, §7001. The DCZA prohibits within the coastal zone "[h]eavy industry uses of any kind" and "off-

_____

[18] In 1986 Delaware adopted its current Subaqueous Lands Act, 65 Del. Laws ch. 508, Del. Code Ann., Tit. 7, ch. 72 (2001), which authorizes DNREC to regulate any potentially polluting use made of Delaware's subaqueous lands and to grant or lease property interests in those lands. See *id.,* §7206(a).

shore gas, liquid or solid bulk product transfer facilities."
§7003. In 1972, Delaware rejected as a prohibited bulk
transfer facility El Paso Eastern Company's request to
build a LNG unloading facility extending from New Jersey
into Delaware. 5 Del. App. 3483 (Letter from David
Keifer, Director of Delaware State Planning Office, to
Barry Huntsinger, El Paso Eastern Company (Feb. 23,
1972)). Shortly before denying El Paso's application,
Delaware notified New Jersey's Department of Environ-
mental Protection (NJDEP), which raised no objection to
Delaware's refusal to permit the LNG terminal.[19] Dela-
ware similarly relied on the DCZA to deny permits for
construction of the Crown Landing unloading facility at
issue in this case. Report 20.

Also in 1972, Congress enacted the federal Coastal Zone
Management Act (CZMA), 86 Stat. 1280, 16 U. S. C. §1451
*et seq.,* which required States to submit their coastal
management programs to the Secretary of Commerce for
review and approval. In return, States with approved
programs would receive federal funding for coastal man-
agement. See §§1454–1455. Delaware's coastal manage-
ment program, approved by the Secretary in 1979, specifi-
cally addressed LNG facilities and reported that "'no site
in Delaware [is] suitable for the location of any LNG im-
port-export facility.'" Report 72 (quoting 4 Del. App. 2591
(Dept. of Commerce, National Oceanic and Atmospheric
Admin. (NOAA), Delaware Coastal Management Program
and Final Environmental Impact Statement 57 (Mar.
1980))). The next year, 1980, New Jersey gained approval
for its coastal management program. The Special Master
found telling, as do we, a representation New Jersey made

―――――――――
[19] 5 Del. App. 3481 (Letter from David Keifer, Director of Delaware
State Planning Office, to Richard Sullivan, Commissioner, NJDEP
(Feb. 17, 1972)); *id.,* at 3485 (Letter from Mr. Sullivan, NJDEP, to Mr.
Keifer (Mar. 2, 1972)).

in its submission to the Secretary:

> "The New Jersey and Delaware Coastal Management agencies . . . have concluded that any New Jersey project extending beyond mean low water *must obtain coastal permits from both states*. New Jersey and Delaware, therefore, will coordinate reviews of any proposed development that would span the interstate boundary to ensure that no development is constructed unless it would be consistent with both state coastal management programs." Report 81 (quoting 4 Del. App. 2657 (NOAA, N. J. Coastal Management Program and Final Impact Statement 20 (Aug. 1980) (emphasis added)).

See also Report 72–73. That representation, the Special Master observed, "is fundamentally inconsistent with the position advanced by New Jersey here, *i.e.*, that only New Jersey has the right to regulate such projects." *Id.,* at 73.

As the Special Master reported, just three structures extending from New Jersey into Delaware were built between 1969 and 2006. Delaware's DNREC issued permits for each of them. *Id.,* at 74–76. One of those projects was undertaken by New Jersey itself. The State, in 1996, sought to refurbish a stone pier at New Jersey's Fort Mott State Park. *Id.,* at 75–76. New Jersey issued a waterfront development permit for the project, but that permit approved structures only to the low-water mark. Delaware's approval was sought and obtained for structures outshore of that point. Even during the pendency of this action, New Jersey applied to Delaware for renewal of the permit covering the portion of the Fort Mott project extending into Delaware. *Ibid.*[20]

————————

[20] New Jersey asserts "the most striking thing about this [course of conduct] evidence is the lack of any reference by . . . New Jersey officials to the [1905] Compact itself, much less to the terms of Article VII." New Jersey Exceptions 48. "All citizens," however, "are presumptively

IV

*New Jersey* v. *Delaware II* upheld Delaware's ownership of the River and subaqueous soil within the twelve-mile circle. The 1905 Compact did not ordain that this Court's 1934 settlement of the boundary would be an academic exercise with slim practical significance. Tending against a reading that would give New Jersey exclusive authority, Article VIII of the Compact, as earlier emphasized, see *supra*, at 11, states: "Nothing herein contained shall affect the territorial limits, rights or jurisdiction of either State of, in or over the Delaware River, or the ownership of the subaqueous soil thereof, except as herein expressly set forth." Nowhere does Article VII "expressly set forth" Delaware's lack of any governing authority over territory within the State's own borders. Cf. Report 43–46.

The Special Master correctly determined that Delaware's once "hands off" policy regarding coastal development did not signal that the State never could or never would assert any regulatory authority over structures using its subaqueous land. *Id.*, at 69–70. In the decades since Delaware began to manage its waters and submerged lands to prevent "a significant danger of pollution to the coastal zone," Del. Code Ann., Tit. 7, §7001, the State has followed a consistent course: Largely with New Jersey's cooperation, Delaware has checked proposed structures and activity extending beyond New Jersey's shore into Delaware's domain in order to "protect the

——————

charged with knowledge of the law." *Atkins* v. *Parker*, 472 U. S. 115, 130 (1985). The 1905 Compact is codified at N. J. Stat. Ann. §§52:28–34 to 52:28–45. We find unconvincing New Jersey's contention that its officials were ignorant of the State's own statutes. The assertion is all the more implausible given New Jersey's recognition of Delaware's regulatory authority in New Jersey's coastal management plan, despite a New Jersey county planning board's objection to that acknowledgment. Report 82; 4 Del. App. 3135 (NOAA, N. J. Coastal Management Program and Final Environmental Impact Statement 499 (Aug. 1980)).

natural environment of [Delaware's] . . . coastal areas."
*Ibid.*

\*    \*    \*

Given the authority over riparian rights that the 1905
Compact preserves for New Jersey, Delaware may not
impede ordinary and usual exercises of the right of ripar-
ian owners to wharf out from New Jersey's shore. The
Crown Landing project, however, goes well beyond the
ordinary or usual. See *supra*, at 5–6. Delaware's classifi-
cation of the proposed LNG unloading terminal as a
"heavy industry use" and a "bulk product transfer fa-
cilit[y]," Del. Code Ann., Tit. 7, §§7001, 7003, has not been,
and hardly could be, challenged as inaccurate.[21] Consis-
tent with the scope of its retained police power to regulate
certain riparian uses, it was within Delaware's authority
to prohibit construction of the facility within its domain.[22]
As recommended by the Special Master, we confirm Dela-
ware's authority to deny permission for the Crown Land-
ing terminal, overrule New Jersey's exceptions, and enter,
with modifications consistent with this opinion, the decree
proposed by the Special Master.

*It is so ordered.*

JUSTICE BREYER took no part in the consideration or
decision of this case.

—————

[21] We agree with the dissent, *post*, at 18–19, that Delaware could not
rationally categorize as a "heavy industry use" a terminal for unloading
cargoes of tofu and bean sprouts. On the other hand, we cannot fathom
why, if Delaware could block a casino, or even a restaurant on a pier
extending into its territory, *post,* at 7, it could not reject a permit for
the LNG terminal described *supra*, at 5–6.

[22] In deploring New Jersey's loss, *post*, at 18–19, the dissent overlooks
alternative sites in New Jersey that could accommodate BP's LNG
project. 7 Del. App. 4306 (Cherry Affidavit).

## DECREE

The Court having exercised original jurisdiction over this controversy between two sovereign States; the issues having been referred to the Special Master appointed by the Court; the Court having received briefs and heard oral argument on New Jersey's exceptions to the Report of the Special Master and Delaware's responses thereto; and the Court having issued its Opinion, *supra*, at 1–23.

It is Hereby Ordered, Adjudged, Declared, and Decreed as follows:

1.(a) The State of New Jersey may, under its laws, grant and thereafter exercise governing authority over ordinary and usual riparian rights for the construction, maintenance, and use of wharves and other riparian improvements appurtenant to the eastern shore of the Delaware River within the twelve-mile circle and extending outshore of the low-water mark; and further

(b) The State of Delaware may, under its laws and subject to New Jersey's authority over riparian rights as stated in the preceding paragraph, exercise governing authority over the construction, maintenance, and use of those same wharves and other improvements appurtenant to the eastern shore of the Delaware River within the twelve-mile circle and extending outshore of the low-water mark, to the extent that they exceed ordinary and usual riparian uses.

(c) In refusing to permit construction of the proposed Crown Landing LNG unloading terminal, Delaware acted within the scope of its governing authority to prohibit unreasonable uses of the river and soil within the twelve-mile circle.

2. Except as hereinbefore provided, the motions for summary judgment of both the States of New Jersey and Delaware are denied and their prayers for relief dismissed with prejudice.

Decree

3. The party States shall share equally in the compensation of the Special Master and his assistants, and in the costs of this litigation incurred by the Special Master.

4. The Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as it may from time to time deem necessary or desirable to give proper force and effect to this Decree or to effectuate the rights of the parties.

# SUPREME COURT OF THE UNITED STATES

_____

No. 134, Orig.

_____

### STATE OF NEW JERSEY, PLAINTIFF *v*. STATE OF DELAWARE

ON BILL OF COMPLAINT

[March 31, 2008]

JUSTICE STEVENS, concurring in part and dissenting in part.

While I agree with most of the reasoning in the Court's opinion, I do not agree with the rule it announces, or with all of the terms of its decree. In my view, the construction and maintenance of wharves and other riparian improvements that extend into territory over which Delaware is sovereign may only be authorized by New Jersey to the extent that such activities are not inconsistent with Delaware's exercise of its police power. I therefore join paragraphs 1(c), 2, 3, and 4 of the Court's decree, and write separately to explain that in my view, New Jersey's authority to regulate beyond the low-water mark on its shore is subordinate to the paramount authority of the sovereign owner of the river, Delaware.

I

At common law, owners of land abutting bodies of water enjoyed certain rights by virtue of their adjacency to that water. See 1 H. Farnham, Law of Waters and Water Rights §62, p. 279 (1904) ("The riparian owner is . . . entitled to have his contact with the water remain intact. This is what is known as the right of access, and includes the right to erect wharves to reach the navigable portion of the stream"). Yet those rights were by no means unlimited; "[w]hile the rights of the riparian owner cannot be

destroyed . . . they are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public." *Id.,* §63, at 284. See also 4 Restatement (Second) of Torts §856, Comment *e* (1977) ("[A] state may exercise its police power by controlling the initiation and conduct of riparian and nonriparian uses of water").[1]

From these authorities it is clear that the rights of riparian landowners are ordinarily subject to regulation by *some* State. The only relevant question, then, for purposes of this case, is *which* State. As the Court notes, "[i]n the ordinary case, the State that grants riparian rights is also the State that has regulatory authority over the exercise of those rights," *ante,* at 13. But the history of the relationship between these two States vis-à-vis their jointly bounded river takes this case out of the ordinary. In light of the 1905 Compact, our previous decision in *New Jersey* v. *Delaware,* 291 U. S. 361 (1934), and the States' course of conduct, I agree with the Court's sensible conclusion that within the twelve-mile circle, the two States' authority over riparian improvements is to some extent overlapping. In my judgment, however, that overlapping authority does not extend merely to the regulation of "riparian structures and operations of extraordinary character" beyond the low-water mark on New Jersey's shore, *ante,* at 3, but to *all* riparian structures and operations

---

[1] See also *Weber* v. *Board of Harbor Comm'rs*, 18 Wall. 57, 64–65 (1873) ("[A] riparian proprietor, whose land is bounded by a navigable stream, has the right of access to the navigable part of the stream in front of his land, and to construct a wharf or pier projecting into the stream, for his own use, or the use of others, *subject to such general rules and regulations as the legislature may prescribe for the protection of the public*" (emphasis added)); *Yates* v. *Milwaukee,* 10 Wall. 497, 504 (1870) ("[The owner of a lot along the river] is . . . entitled to the rights of a riparian proprietor whose land is bounded by a navigable stream . . . *subject to such general rules and regulations as the legislature may see proper to impose*" (emphasis added)).

extending out from New Jersey into Delaware's domain. I would hold, therefore, that New Jersey may only grant, and thereafter exercise governing authority over, the rights of construction, maintenance, and use of wharves and other riparian improvements beyond the low-water mark to the extent that the grant and exercise of those rights is not inconsistent with the police power of the State of Delaware.

## II

In *Virginia* v. *Maryland,* 540 U. S. 56, 80 (2003), I set forth my view that the rights enjoyed by riparian land-owners along the Virginia shore of the Potomac River were subject to regulation by the owner of the river, Maryland. I there explained that "th[e] landowners' riparian rights are—like all riparian rights at common law—subject to the paramount regulatory authority of the sovereign that owns the river, [Maryland]," *id.,* at 82 (dissenting opinion). I would have held, therefore, that it was within Mary-land's power to prevent the construction of the water intake facility that Fairfax County, Virginia, wished to build. *A fortiori,* then—putting to one side the distinctions the Court today draws between the two cases, *ante,* at 17–18—Delaware possesses the authority, under its laws, to restrict the construction of the proposed liquified natural gas facility that would extend hundreds of feet into its sovereign territory.

But inherent in the notion of concurrency are limits to the authority of even the sovereign that owns the river. In *Virginia* v. *Maryland, supra,* I noted that the case did not require the Court to "determine the precise extent or character of Maryland's regulatory jurisdiction," because the issue presented was merely "whether Maryland may impose *any* limits on . . . Virginia landowners whose prop-erty happens to abut the Potomac." *Id.,* at 82 (dissenting opinion). Similarly, in this case we need not definitively

settle the extent to which there may exist limitations on Delaware's exercise of authority over its river and improvements thereon; for even Delaware's counsel conceded at argument that Delaware could not impose a total ban on the construction of wharves extending out from New Jersey's shores.  Tr. of Oral Arg. 49, 50.  Similarly, Delaware should not be permitted to treat differently riparian improvements extending outshore from New Jersey's land and those commencing on Delaware's own soil, absent some reasonable police-power purpose for that differential treatment.  Apart from those clear constraints, however— and subject to applicable federal law[2]—in my view it is Delaware that possesses the primary authority over riparian improvements extending into its territory.

### III

Despite my differing views set forth herein, I do agree with the conclusion that Delaware may prohibit construction of the facility that spawned this complaint, and therefore join the portion of the Court's decree so finding.

---

[2] See 4 Restatement (Second) of Torts §856, Comment *e* (1977) ("The United States may prohibit, limit and regulate the diversion, obstruction or use of navigable waters . . . if those acts affect the navigable capacity of navigable waters").

# SUPREME COURT OF THE UNITED STATES

No. 134, Orig.

## STATE OF NEW JERSEY, PLAINTIFF *v.* STATE OF DELAWARE

ON BILL OF COMPLAINT

[March 31, 2008]

JUSTICE SCALIA, with whom JUSTICE ALITO joins, dissenting.

With all due respect, I find the Court's opinion difficult to accept. The New Jersey-Delaware Compact of 1905 (Compact or 1905 Compact), Art. VII, 34 Stat. 860, addressed the "exercise [of] riparian jurisdiction," and the power to "make grants . . . of riparian . . . rights." The particular riparian right at issue here is the right of wharfing out. All are agreed that jurisdiction and power over that right were given to New Jersey on its side of the Delaware River. The Court says, however, that that jurisdiction and power was not exclusive. I find that difficult to accept, because if Delaware could forbid the wharfing out that Article VII allowed New Jersey to permit, Article VII was a ridiculous nullity. That could not be what was meant. The Court seeks to avoid that obstacle to credibility by saying that Delaware's jurisdiction and power is limited to forbidding "activities that go beyond the exercise of ordinary and usual riparian rights." *Ante,* at 15. It is only "riparian structures and operations of *extraordinary character*" over which Delaware retains "overlapping authority to regulate." *Ante,* at 3 (emphasis added). But that also is difficult to accept, because the Court explains neither the meaning nor the provenance of its "extraordinary character" test. The exception (whatever it means) has absolutely no basis in prior law, which

regards as beyond the "ordinary and usual" (and hence beyond the legitimate) only that wharfing out which interferes with navigation. So unheard-of is the exception that its first appearance in this case is in the Court's opinion.

I would sustain New Jersey's objections to the Special Master's Report.

## I

I must begin by clearing some underbrush. One of Delaware's principal arguments—an argument accepted by the Master and implicitly accepted by the Court—is that the 1905 Compact must not be construed to limit Delaware's pre-Compact (albeit at the time unrecognized) sovereign control over the Delaware River, because of the "strong presumption against defeat of a State's title" in interpreting agreements. See Report of Special Master 42–43 (Report) (quoting *United States* v. *Alaska*, 521 U. S. 1, 34 (1997) (internal quotation marks omitted)). According to Delaware, this presumption establishes that the 1905 Compact gave New Jersey the authority to *allocate* riparian rights, but left with Delaware the power to *veto* exercises of those rights under its general police-power authority.

I have written of this presumption elsewhere that it "has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation. It is simply a rule of presumed (or implied-in-fact) intent." *United States* v. *Winstar Corp.*, 518 U. S. 839, 920 (1996) (opinion concurring in judgment). It is a manifestation of the commonsense intuition that a State will rarely contract away its sovereign power. That intuition is sound enough in almost all state dealings with private citizens, and in some state dealings with other States. It has no application here, however, because the whole purpose of the 1905 Compact was precisely to come to a compromise agreement on the exercise of the two

States' sovereign powers. Entered into at a time when Delaware and New Jersey disputed the location of their boundary, the Compact demarcated the authority between the two States with respect to service of civil and criminal process on vessels, rights of fishery, and riparian rights on either side of the Delaware River within the circle of a 12-mile radius centered on the town of New Castle, Delaware. See Compact, 34 Stat. 858; *New Jersey* v. *Delaware*, 291 U. S. 361, 377–378 (1934) *(New Jersey* v. *Delaware II)*. There is no way the Compact can be interpreted *other than* as a yielding by both States of what they claimed to be their sovereign powers. The only issue is *what* sovereign powers were yielded, and that is best determined from the language of the Compact, with no thumb on the scales.

Besides relying on the presumption, the Special Master believed (and the Court believes) that New Jersey's claims must be viewed askance because it is implausible that Delaware would have "given up all governing authority over the disputed area while receiving nothing in return." *Ante*, at 13. But Delaware received plenty in return. First of all, it assured access of its citizens to fisheries on the side of the river claimed by New Jersey—something it evidently cared more about than the power to control wharfing out from the Jersey shore, which it had never theretofore exercised. And it obtained (as the Compact observed) "the amicable termination" of New Jersey's then-pending original action in the Supreme Court, which had "been pending for twenty-seven years and upwards." 34 Stat. 858–859. How plausible it was that Delaware would give up anything to get rid of that suit surely depends upon how confident Delaware was that it would prevail. And to tell the truth, the case appeared to be going badly. As the Compact observed, the Supreme Court had issued a preliminary injunction against Delaware "restraining the execution of certain statutes of the

State of Delaware relating to fisheries." *Id.*, at 859. The order issuing that injunction had remarked that Delaware had now "interfered with and claimed to control the right of fishing" which New Jerseyites had "heretofore been accustomed" to exercise without Delaware's interference for over 70 years. Order in *New Jersey* v. *Delaware*, No. 1, Orig. (filed 1877), Lodging for Brief of State of Delaware in Opposition to State of New Jersey's Motion to Reopen (Tab 1). By providing for dismissal of New Jersey's suit, the Compact assured Delaware that the Supreme Court's rather ominous sounding preliminary order would not become the Court's holding, perhaps the consequence of a rationale that gave New Jersey jurisdiction in the river.

## II

Article VII of the 1905 Compact between New Jersey and Delaware reads as follows:

> "Each State may, on its own side of the river, continue to exercise riparian jurisdiction of every kind and nature, and to make grants, leases, and conveyances of riparian lands and rights under the laws of the respective States." 34 Stat. 860.

As the Court recognizes, this provision allocates to each State jurisdiction over a bundle of rights that, at the time of the Compact, riparian landowners, or "owners of land abutting on bodies of water," possessed under the common law "by reason of their adjacency." 1 H. Farnham, Law of Waters and Water Rights §62, p. 278 (1904) (Farnham). Those riparian rights included the right to "fill in and to build wharves and other structures in the shallow water in front of [the upland] and below low-water mark." *Id.*, §113b, at 534. A wharf, the type of structure at issue here, "imports a place built or constructed for the purpose of loading or unloading goods." *Id.*, §111, at 520, n. 1. It was considered "a necessary incident of the right [to construct

wharves and piers] that they shall project to a distance
from the shore necessary to reach water which shall float
vessels, the largest as well as the smallest, that are en-
gaged in commerce upon the water into which they pro-
ject." *Id.*, at 522. Thus, wharves could be built up to "the
point of navigability," J. Gould, Treatise on the Law of
Waters, including Riparian Rights §181, p. 352 (2d ed.
1891) (Gould), so long as they did not "interfere needlessly
with the right of navigation" possessed by members of the
general public upon navigable waters, 1 Farnham §111,
at 521.

The two States would have been acquainted with this
common law. New Jersey case law comported with the
hornbook rules. According to the State's Court of Errors
and Appeals, it was "undoubted" and the "common under-
standing" that "the owners of land bounding on navigable
waters had an absolute right to wharf out and otherwise
reclaim the land down to and even below low water, pro-
vided that they did not thereby impede the paramount
right of navigation." *Bell* v. *Gough*, 23 N. J. L. 624, 658
(1852) (opinion of Elmer, J.); see also J. Angell, Treatise on
the Right of Property in Tide Waters and in the Soil and
Shores Thereof 234 (1847) ("[T]he right of a riparian pro-
prietor to 'wharf out' into a public river, is a local custom
in New Jersey"); Gould §171, at 342 ("[T]he common un-
derstanding in [New Jersey] carries the right [to wharf
out] even below low-water mark, provided there is no
obstruction to the navigation"). Case authority in Dela-
ware seems to be lacking, but in *New Jersey* v. *Delaware II*
the State assured the Special Master at oral argument
that "it is undoubtedly true in the State of Delaware . . .
that the upland owner had the right to wharf out . . .
subject only that you must not . . . obstruct navigation."
1 App. of New Jersey on Motion for Summary Judgment
126a–1 (hereinafter NJ App.).

Thus, under the plain terms of the 1905 Compact, each

State had "jurisdiction"—the "authority of a sovereign power to govern or legislate," Webster's International Dictionary of the English Language (1898)—over wharfing out on "its own side of the river." To emphasize that this jurisdiction was plenary—that it included, for example, not merely the power to prohibit wharfing out but also the power to permit it—Article VII specified that the jurisdiction it conferred would be "of every kind and nature."

And finally, the jurisdictional grant was not framed as though it was conferring on either State some hitherto unexercised power. Rather, the Compact provided that each State would "*continue to*" exercise the allocated "riparian jurisdiction," clearly envisioning that each State would wield in the future the same authority over riparian rights it had wielded in the past. 34 Stat. 860 (emphasis added). This is significant because, before adoption of the Compact in 1905, New Jersey alone had regulated the construction of riparian improvements on New Jersey's side of the Delaware River. It had repeatedly authorized the construction of piers and wharves that extended beyond the low-water line. App. to Report C–4 to C–5 (listing New Jersey Acts authorizing riparian landowners to construct wharves); 7 NJ App. 1196a–1199a. Delaware, by contrast, had never regulated riparian rights on the New Jersey side, and indeed, at the time of the Compact even on its own side there was "little evidence of [the State's] active involvement in shoreland development . . . ." Report 69.

I would think all of this quite conclusive of the fact that New Jersey was given full and exclusive control over riparian rights on the New Jersey side. The Court concludes that this was not so, however, in part because of the alleged implausibility of Delaware's "giv[ing] up all governing authority . . . while receiving nothing in return," *ante*, at 13 (a mistaken contention that I have already addressed), and in part because "riparian jurisdiction" is

different from "exclusive jurisdiction," the term used in an 1834 Compact between New Jersey and New York, which referred to "the exclusive jurisdiction of and over the wharves, docks, and improvements, made and to be made on the shore . . . ." Act of June 28, 1834, ch. 126, Art. Third, 4 Stat. 710.

I willingly concede that exclusive riparian jurisdiction is not the same as "exclusive jurisdiction" *simpliciter*. It includes only exclusive jurisdiction over *riparian rights* which, as I have described, include the right to erect wharves *for the loading and unloading of goods*. That jurisdiction does not necessarily include, for example, the power to permit or forbid the construction of a casino on the wharf, or even the power to serve legal process on the wharf. Jurisdiction to control such matters—which were not established as part of riparian rights by the common-law and hornbook sources that the parties relied on in framing the Compact—may well fall outside the scope of the "riparian jurisdiction" that the Compact grants. See, *e.g., Tewksbury* v. *Deerfield Beach*, 763 So. 2d 1071 (Fla. App. 1999) (operation of a restaurant on a dock is not included within riparian rights). Such powers—which may well have been conveyed by a grant of "exclusive jurisdiction" such as that contained in the New York-New Jersey Compact—are not at issue in this case. What is at issue is jurisdiction over the core riparian right of building a wharf to be used for the loading and unloading of cargo. And that *that* jurisdiction was given exclusively to New Jersey is made perfectly clear by the Compact's recognition of each State's riparian jurisdiction only *"on its own side of the river."* 34 Stat. 860 (emphasis added). It does not take vast experience in textual interpretation to conclude that this implicitly excludes each State's riparian jurisdiction *on the other State's side of the river. (Inclusio unius est exclusio alterius.)* There was no need, therefore, to specify *exclusive* riparian jurisdiction.

   The Court's position gains no support from the fact that the rights of a private riparian owner "'are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public.'" *Ante,* at 12 (quoting 1 Farnham §63, at 284). The Compact did not purport to convey mere private rights, but rather "riparian *jurisdiction* of every kind and nature." If that means anything at all, it means that *New Jersey* is the State that "may regulate [the] exercise [of the rights of a private riparian owner] in the interest of the public." Delaware's contention that it retains the authority to prohibit under its police power even those activities that are specifically allowed to New Jersey under the Compact renders not just Article VII but most of the Compact a virtual nullity. Article III, for example, gives the States "common right of fishery throughout, in, and over the waters" of the Delaware. 34 Stat. 859. But under its police powers a sovereign State could regulate fishing within its public navigable waters. See Gould §189, at 362. Thus, under Delaware's view, just as its ownership of the riverbed would allow it to trump New Jersey's authority to permit wharfing out, so also its ownership of the riverbed would allow it to prevent fishing. That would be an extraordinary result, since the litigation the 1905 Compact was designed to resolve arose over fishing rights, after Delaware enacted a law in 1871 requiring New Jersey fishermen to obtain a Delaware license. See Report 3–6.

### III

   The Court, following the Special Master's analysis, see Report 68–84, asserts that today's judgment is supported by the parties' course of conduct after conclusion of the Compact. I frankly think post-Compact conduct irrelevant to this case, since it can properly be used only to clarify an ambiguous agreement, and there is no ambiguity here. The Court, moreover, overstates the post-Compact conduct

favoring Delaware's position and understates the post-Compact conduct favoring New Jersey. But even if post-Compact conduct is consulted, no such conduct—none whatever—supports the Court's "extraordinary character" test, whereas several instances of such conduct strongly support the resolution I have suggested in this dissent.

The Court relies upon four instances of Delaware's exercise of jurisdiction over wharfing out from the Jersey shore, and two instances of New Jersey's acquiescence in such an exercise—all postdating 1969. As to the former, the three structures extending from New Jersey into Delaware built between 1969 and 2006 were permitted by Delaware, *ante*, at 21; and another application for a permit was denied, *ante*, at 20. The Court never establishes, however, that these instances of Delaware's assertion of jurisdiction related to wharves of "extraordinary character," which is the only jurisdiction that the Court's decree confers upon Delaware. At best, these assertions of jurisdiction support not the Court's opinion, but rather Delaware's assertion that it may regulate all wharves on the river—an assertion that the Court rejects. The same mismatch is present with both instances of New Jersey's asserted acquiescence. One of them was New Jersey's application for Delaware's permission to refurbish the stone pier at Fort Mott State Park, described *ante*, at 21. That construction could not conceivably be characterized as of "extraordinary character," and thus New Jersey did not need to ask Delaware for permission under the Court's theory. In the other instance, described *ante*, at 20–21, New Jersey's Coastal Management Agency assured the Secretary of Commerce that "'*any* New Jersey project extending beyond mean low water'" (emphasis added) had to be approved by Delaware's Coastal Management Agency as well as New Jersey's. This again supports

Delaware's theory of this case, but not the Court's.*

While post-Compact conduct provides no—absolutely *zero*—support for the Court's interpretation, it provides substantial support for the one I have suggested. In *New Jersey* v. *Delaware II*, a case before this Court involving precisely the meaning of the Compact, the Attorney General of Delaware (obviously authorized to present the State's position on the point) conceded to the Special Master that "Article VII of the Compact is obviously merely a recognition of the rights of the riparian owners of New Jersey and a *cession* to the State of New Jersey by the State of Delaware of jurisdiction to regulate those rights." 1 NJ App. 123a (emphasis added). And at oral argument before the Special Master, Delaware's Special Counsel—Clarence A. Southerland, a former State Attorney General and future Chief Justice of the Supreme Court of Delaware, see Delaware Bar in the Twentieth Century 375 (H. Winslow, A. Bookout, & P. Hannigan eds. 1994)—explained that "the Compact of 1905 expressly acknowledged the rights of the citizens of New Jersey, at

_____

*The post-Compact-conduct argument is not the only portion of the Court's reasoning that is a mismatch with its conclusion. So is its reliance upon Article VIII of the Compact, *ante*, at 11, 22—an argument so weak that it deserves only a footnote response. Article VIII provides that nothing in the Compact "shall affect the territorial limits, rights, or jurisdiction of either State . . . *except as herein expressly set forth*." 34 Stat. 860 (emphasis added). But New Jersey's riparian rights *are* expressly set forth, so the only question—the one I have addressed above—is what those rights consist of. But accepting the Court's over-reading of Article VIII (which presumably requires each of the riparian rights to be named one by one), it is utterly impossible to see why Article VIII is any more "expres[s]" in setting forth New Jersey's authority over wharves that lack "extraordinary character" than it is in setting forth her authority over wharves that possess it. Once again, the argument supports not the Court's holding, but rather Delaware's more expansive theory that it may regulate any and all wharves built from the Jersey shoreline. There is, to tell the truth, nothing whatever to support the Court's holding.

least, by implication to wharf out" and that New Jersey possessed "all the right *to control the erection of those wharves and to say who shall erect them*." 1 NJ App. 126a–1 (emphasis added). And in its Supreme Court brief in that litigation, Delaware assured the Court, without conditions, that "Delaware has never questioned the right of citizens of New Jersey to wharf out *to navigable water* nor can such a right be questioned now because it is clearly protected by the Compact of 1905 between the States." *Id.*, at 139a (emphasis added). Delaware's Supreme Court brief rejected New Jersey's argument that, if the Court found the boundary line to be the low-water mark on the New Jersey shore, "the interests of the riparian owners will be either destroyed or seriously prejudiced." That concern, Delaware said, was misguided because the 1905 Compact "recognized the rights of riparian owners in the river to wharf out." *Id.*, at 140a. "The effect of Article VII of the Compact," the brief explained, "was that the State of Delaware recognized the rights of the inhabitants on the east side of the river to wharf out to navigable water. This right had never been questioned and was undoubtedly inserted to put beyond question the *riparian rights* (as distinguished from *title*) of land owners in New Jersey." *Id.*, at 141a. These concessions are powerful indication that Delaware's understanding of the Compact was the same as the one I assert.

## IV

Our opinion in *Virginia* v. *Maryland*, 540 U. S. 56 (2003), effectively decided this case. It rejected the very same assertion of a riverbed-owning State's supervening police-power authority over constructions into the river from a State that had been conceded riparian rights. That case involved two governing documents rather than (as here) only one. The first, a 1785 compact, provided:

"'The citizens of each state respectively shall have full

property in the shores of Potowmack river adjoining their lands, with all emoluments and advantages thereunto belonging, and the privilege of making and carrying out wharves and other improvements, so as not to obstruct or injure the navigation of the river.'" *Id.*, at 62.

The second, an arbitration award of 1877 that interpreted the earlier compact, read as follows:

"'Virginia is entitled not only to full dominion over the soil to low-water mark on the south shore of the Potomac, but has a right to such use of the river beyond the line of low-water mark as may be necessary to the full enjoyment of her riparian ownership, without impeding the navigation or otherwise interfering with the proper use of it by Maryland, agreeably to the compact of seventeen hundred and eighty-five.'" *Id.*, at 62–63.

We rejected Maryland's police-power authority to forbid Virginia's construction of a water intake structure that extended into Maryland territory, and held that "Virginia's right 'to erect . . . structures connected with the shore' is inseparable from, and 'necessary to,' the 'full enjoyment of her riparian ownership' of the soil to low-water mark." *Id.*, at 72. Maryland, we observed, was "doubtless correct that if her sovereignty over the River was well settled as of 1785, we would apply a strong presumption against reading the Compact as stripping her authority to regulate activities on the River." *Id.*, at 67. But because the "scope of Maryland's sovereignty over the River was in dispute both before and after the 1785 Compact," no such presumption existed. *Id.*, at 68.

Today's opinion, quoting the Special Master, claims that the result in *Virginia* v. *Maryland* turned on "'the unique language of the compact and arbitration award involved in

that case.'" *Ante*, at 18 (quoting Report 64, n. 118). But the case did not say that. And of course virtually every written agreement or award has "unique language," so if we could only extend to other cases legal principles pertaining to identical language our interpretive jurisprudence would be limited indeed. The documents in *Virginia* v. *Maryland* said in other words precisely what the Compact here said: that one of the States (there, Virginia, here, New Jersey) was given riparian rights, including the right to construct wharves and improvements. And the holding of the case was that those rights could be exercised free of police power or other interference by the State owning the riverbed.

The Court contends that in *Virginia* v. *Maryland* the arbitration award, rather than the compact, "was definitive," because it recognized the right of Virginia "'*qua* sovereign,'" and nowhere made the right "'subject to Maryland's regulatory authority.'" *Ante,* at 18 (quoting 540 U. S., at 72). But Article VII of the Compact here at issue likewise spoke of the rights of New Jersey "*qua* sovereign" (what else does the "exercise [of] riparian *jurisdiction*" mean?) and similarly did not make those rights subject to Delaware's regulatory authority. We stressed in *Virginia* v. *Maryland* that the salient factor in the interpretation of the compact (and hence in the arbitration award's interpretation of the compact) was that it was entered into (like the Compact here) by way of settlement of a continuing boundary dispute. "If any inference at all is to be drawn from [the compact's] silence on the subject of regulatory authority," we said, "it is that each State was left to regulate the activities of her own citizens." *Id.*, at 67. *Virginia* v. *Maryland* effectively decided this case.

V

Finally, I must remark at greater length upon the Court's peculiar limitation upon New Jersey's wharfing-

out rights—that it excludes wharves of "extraordinary character." But for that limitation, the Court's conclusion is precisely the same as my own: "Given the authority over riparian rights that the 1905 Compact preserves for New Jersey, Delaware may not impede ordinary and usual exercises of the right of riparian owners to wharf out from New Jersey's shore." *Ante*, at 23. The Court inexplicably concludes, however, that the liquefied natural gas (LNG) unloading wharf at stake in this litigation "goes well beyond the ordinary or usual." *Ibid.* Why? Because it possesses "extraordinary character."

To our knowledge (and apparently to the Court's, judging by its failure to cite any authority) the phrase has never been mentioned before in any case involving limitations on wharfing out. What in the world does it mean? Would a pink wharf, or a zig-zagged wharf qualify? Today's opinion itself gives the phrase no content other than to say that "Delaware's classification of the proposed LNG unloading terminal as a 'heavy industry use' and a 'bulk product transfer facilit[y],' . . . has not been, and hardly could be, challenged as inaccurate." *Ibid.* This rationale is bizarre. There is no reason why *any* designation by the Delaware Department of Natural Resources and Environmental Control would be relevant to, let alone controlling on, the meaning of the 1905 Compact; and no reason why New Jersey's authority under the 1905 Compact should turn on the state-law question whether Delaware "rationally categorize[s]" a wharf under its own statutes, *ante*, at 23, n. 21. Wharves were commonly used for "heavy industry use" when the 1905 Compact was adopted, and their primary commercial use was to transfer bulk cargoes. One roughly contemporaneous book on the design and building of wharves in America included information on appropriate pavement material to enable use of trucks on wharves, the proper method of laying down railroad tracks, and the construction of hatch cranes for

unloading cargo. See C. Greene, Wharves and Piers: Their Design, Construction, and Equipment 191–194, 206–215 (1917). The Court gives no reason why the terminal's character as a "heavy industry use" and a "bulk product transfer facilit[y]" matters in the slightest. Indeed, the Court does not take its state-law reason for "extraordinary character" seriously, conceding that Delaware could not regulate an *identical* wharf for the "bulk product transfer" of "tofu and bean sprouts," *ante*, at 23, n. 21.

Apart from the Delaware Department's "heavy industry use" and "bulk product transfer" designations, the Court cites, as support for its conclusion that this wharf is of "extraordinary character" its own factual background section describing the wharf. See *ante*, at 23 (citing *ante*, at 5–6). It is not clear which, if any, of the facts discussed there the Court claims to be relevant, and I am forced to speculate on what they might be.

Could it be the size of the wharf, which is 2,000 feet long, see *ante*, at 6, and extends some 1,455 feet into Delaware territory, see Brief for BP America Inc. as *Amicus Curiae* 1–2? But the Court cites *not a single source* for this length limitation upon wharfing out. We did not intimate, in holding in *Virginia* v. *Maryland* that Virginia could authorize construction of a water intake pipe extending 725 feet from its shoreline into Maryland, see 540 U. S., at 63, that the result turned on the length of the pipe. As I have discussed, the common law *did* establish a size limitation for wharves: the wharf could not be extended so far as to interfere needlessly with the public's "right of navigation" in navigable waters. 1 Farnham §111, at 521. Wharves constructed to access the water could "project to a distance from the shore necessary to reach water which shall float vessels, *the largest as well as the smallest.*" *Id.*, §111, at 522 (emphasis added). Delaware has not claimed that the wharf in this case will interfere with navigation of the river, which is approxi-

mately one mile wide at this location, see Brief for BP America Inc. as *Amicus Curiae* 2. And the record reveals that New Jersey, at least, anticipated that wharves on its side of the river could extend as far as the wharf in this case by establishing pierhead lines in 1877 and 1916 that extended "*below* low water mark at distances varying from 378 to 3,550 feet." 1 NJ App. 135a; see also 3 *id.*, at 376a (affidavit of Richard G. Castagna). (Pierhead lines mark the permissible "outshore limit of structures of any kind." Greene, *supra*, at 27.)

Could the fact rendering this a wharf of "extraordinary character" be that its construction would require the dredging of 1.24 million cubic yards of soil within Delaware's territory? *Ante*, at 6. This is suggested, perhaps, by the portion of the Decree which says that "Delaware acted within the scope of its governing authority to prohibit unreasonable uses of the . . . soil within the twelve-mile circle." *Ante*, at 24; see also *ante*, at 6, n. 8. But no again. Although the record contains no evidence of the dredge volumes required to construct the wharves on the river at the time of the Compact's adoption, it does show that an 1896 navigational improvement required the dredging of 35 million cubic yards from the Delaware River, and a 1907 dredging at Cape May Harbor, New Jersey, removed 19.7 million cubic yards. 7 NJ App. 1234a (affidavit of J. Richard Weggel). At the very least, the dredging of 1.24 million cubic yards "would have been familiar to or ascertainable by individuals interested in riparian uses or structures at the time the Compact was signed or ratified." *Id.*, at 1227a. I do not know what to make of the Court's response that the instances of dredging that I have cited involved "public works." *Ante*, at 6, n. 8. Is that a limitation upon the Court's holding—only *private* wharves of "extraordinary character" can be regulated by Delaware? But in fact dredging seems to have nothing to do with the issue, since (once again) the Court

acknowledges that the same wharf for tofu and bean sprouts would be OK.

Could the determinative fact be that the wharf would service "[s]upertankers with capacities of up to 200,000 cubic meters (more than 40 percent larger than any ship then carrying natural gas)," *ante*, at 6; that these ships "would pass densely populated areas" and require establishment of "a moving safety zone [that] would restrict other vessels 3,000 feet ahead and behind, and 1,500 feet on all sides," *ante*, at 6, n. 7? This is suggested, perhaps, by the portion of the Decree which says that "Delaware acted within the scope of its governing authority to prohibit unreasonable uses of the river . . . within the twelve-mile circle." *Ante*, at 24. But surely not. Whatever power Delaware has to restrict traffic on the waters of the United States (a question not presented by this case, though one that seems not to inhibit the Decree's blithe positing of state "authority to prohibit unreasonable uses of the river," *ibid.*), it has no bearing on whether New Jersey can build the *wharf* without Delaware's interference.

Could the determinative fact be that the wharf will be used to transport liquefied natural gas, which is dangerous? No again. The Court cites no support, and I am aware of none, for the proposition that the common law forbade a wharf owner to load or unload hazardous goods. At the time of the Compact's adoption, congressional sources reported that the Delaware River was used to transport, among other items, coal tar and pitch, sulfur, gunpowder, and explosives. Annual Report of the Chief of Engineers, United States Army, H. R. Doc. No. 22, 59th Cong., 2d Sess., 1031–1033 (App. H) (1906) (tabulating commerce on the Delaware River by item in 1904 and 1905). Books published some time after the adoption of the Compact discuss the proper handling of seaborne "dangerous goods," including liquids such as benzene,

petroleum, and turpentine. See J. Aeby, Dangerous Goods (2d ed. 1922); R. MacElwee & T. Taylor, Wharf Management: Stevedoring and Storage 41, 221 (1921). There is not a shred of evidence that the parties to the Compact understood that New Jersey and Delaware would not be authorized to grant riparian rights for the loading and unloading of goods that are—under some amorphous and unexplained criteria—dangerous.

I say that none of these factors has any bearing upon whether, at law, the wharfing out at issue here is anything more than the usual and ordinary exercise of a riparian right. I am not so rash as to suggest, however, that these factors had nothing to do with the Court's decision. After all, our environmentally sensitive Court concedes that if New Jersey had approved a wharf of equivalent dimensions, to accommodate tankers of equivalent size, carrying tofu and bean sprouts, Delaware could not have interfered. See *ante*, at 23, n. 21.

* * *

According to one study, construction activities on the LNG facility in this case would have created more than 1,300 new jobs, added $277 million to New Jersey's gross state product, and produced $13 million in state and local tax revenues. J. Seneca et al., Economic Impacts of BP's Proposed Crown Landing LNG Terminal 65, online at http://www.policy.rutgers.edu/news/reports/BPCrownLanding.pdf (as visited Mar. 28, 2008, and available in Clerk of Court's case file). Operation of the facility was projected to generate 231 permanent jobs, and more than $88 million in state and local tax revenues over a 30-year period. *Ibid.* Its delivery capacity would represent 15 percent of the current consumption of natural gas in the region. *Id.*, at 66. In holding that Delaware may veto the project, the Court owes New Jersey—not to mention an energy-starved Nation—something more than its casual and

unsupported statements that the wharf possesses "extraordinary character" and "goes well beyond the ordinary or usual."

Today's decision does not even have the excuse of achieving a desirable result. If one were to design, *ex ante*, the socially optimal allocation of the power to permit and forbid wharfing out, surely that power would be lodged with the sovereign that stands most to gain from the benefits of a wharf, and most to lose from its environmental and other costs. Unquestionably, that is the sovereign with jurisdiction over the land from which the wharf is extended. Delaware and New Jersey doubtless realized this when they agreed in 1905 that each of them would have jurisdiction over riparian rights on its own side of the river. The genius of today's decision is that it creates irrationality where sweet reason once prevailed— straining mightily, against all odds, to assure that the power to permit or forbid "heavy industry use" wharves in New Jersey shall rest with Delaware, which has no interest whatever in facilitating the delivery of goods to New Jersey, which has relatively little to lose from the dangerous nature of those goods or the frequency and manner of their delivery, and which may well have an interest in forcing the inefficient location of employment- and tax-producing wharves on its own shore. It makes no sense.

Under its Decree, "[t]he Court retains jurisdiction to entertain such further proceedings, enter such orders, and issue such writs as it may from time to time deem necessary or desirable to give proper force and effect to this Decree or to effectuate the rights of the parties." *Ante*, at 25. This could mean, I suppose, that we can anticipate a whole category of original actions in this Court that will clarify, wharf by wharf, what is a wharf of "extraordinary character." (Who would have thought that such utterly indefinable and unpredictable complexity lay hidden within the words of the Compact?) More likely, however,

prospective builders of "heavy industry use" wharves from the New Jersey shore—of whatever size—will apply to Delaware and simply go elsewhere if rejected.

The wharf at issue in this litigation would have been viewed as an ordinary and usual riparian use at the time the two States entered into the 1905 Compact. Delaware accordingly may not prohibit its construction. I respectfully dissent from the Court's judgment to the contrary.